1
2
3
4
5
6

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

7

8   MEHRAD GHASEDI ,

9                              Petitioner,          CASE NO. 2:25-cv-01984-RSM-BAT

10        v.                                        **REPORT AND**
                                                    **RECOMMENDATION**
11   CAMMILLA WAMSLEY, et al.,

12                              Respondents.

13

14        Petitioner Mehrad Ghasedi, a national of Iran currently in immigration detention, filed a

15   petition for writ of habeas corpus under 28 U.S.C. § 2241 through counsel to obtain his release

16   and prevent removal to a third country. Ghasedi is currently in the custody of the Department of

17   Homeland Security, Immigration and Customs Enforcement (ICE), at Northwest Immigration

18   and Customs Enforcement Processing Center in Tacoma, Washington. ICE originally detained

19   him for a few months in 2021 following a felony drug conviction, and he was ordered removed

20   to Iran, but he was never removed and was released. In July 2025, ICE re-detained him at a

21   check-in. He now challenges his detention as unlawful and unconstitutional.

22        Having reviewed the petition (Dkt. 1), the government's response (Dkt. 6), and Ghasedi's

23   response to the government (Dkt. 8), the Court recommends that the petition be **GRANTED** and

     that a writ of habeas corpus issue directing Ghasedi's release from custody subject to appropriate

REPORT AND RECOMMENDATION - 1

1 | conditions of supervision.

2 | **BACKGROUND**

3 | Petitioner Mehrad Ghasedi is a 38-year-old national of Iran. Dkt. 1 at ¶ 1 (petition). He

4 | arrived in the United States for lawful permanent residence at age 14, on March 6, 2001. *Id.*; Dkt.

5 | 6 at 4 (government's response). He has lived in the United States for 24 years, during which time

6 | he has attended and graduated from high school, learned to speak English, and maintained

7 | gainful employment. Dkt. 1 at ¶ 44. He was convicted in 2019 of felony delivery of heroin and

8 | possession of methamphetamine. *Id.* After he served his sentence, ICE took him into custody on

9 | February 25, 2021, issued him a Notice to Appear, and charged him as removable. *Id.* at ¶ 45.

10 | On March 24, 2021, an immigration judge ordered Ghasedi removed to Iran. Dkt. 1 at

11 | ¶ 47. He appeared *pro se* in those removal proceedings, did not apply for relief from removal,

12 | and waived appeal. Dkt. 8-1 at ¶ 9 (Ghasedi declaration); Dkt. 6 at 5.

13 | ICE detained him from February 25, 2021 to July 29, 2021. Dkt. 1 at ¶ 48. During his

14 | detention, ICE interviewed him regarding his travel document and sent a travel document request

15 | to Iran. Dkt. 7 at ¶¶ 8–9 (De Castro declaration). ICE continued to communicate with the Iran

16 | embassy, but did not receive a travel document. *Id.*

17 | After a post-order custody review, Ghasedi was released on July 29, 2021 under an order

18 | of supervision which required him, among other things, to report in person to the ICE office in

19 | Eugene, Oregon; assist ICE in obtaining travel documents; provide ICE with written copies of

20 | requests to consulates for issuance of a travel document; wear an ankle monitoring device; notify

21 | ICE and obtain approval for travel outside Oregon of more than 48 hours; and commit no crimes.

22 | *Id.* at ¶ 49; Dkt. 8-1 at 19 (order of supervision). The record does not reflect why Ghasedi was

23 | released.

1   While released, Ghasedi lived with his mother in Eugene, Oregon. Dkt. 1 at ¶ 50. He

2   worked for a roofing company until he became ill before the end of last year, and assisted his

3   mother in caring for disabled adults at her adult care home business. Dkt. 8-1 at ¶ 14. Ghasedi

4   contends that, during his release, he fully complied with the conditions of the order of

5   supervision. *Id.* at ¶ 13; Dkt. 1 at 51. The government claims Ghasedi violated the conditions of

6   release: he left Oregon in December 2021 and was placed under more regular reporting as a

7   result, and in March 2022 the GPS monitor revealed he had left Oregon several times. Dkt. 7 at

8   ¶ 11. Ghasedi replies that all his trips were less than 48 hours, which did not trigger the

9   requirement to notify ICE. Dkt. 8-1 at ¶ 15. He agrees that because of the "issues" with travel,

10  ICE thereafter told him he needed to notify of all travel. *Id.* The government also claims Ghasedi

11  was "determined as not being cooperative in obtaining a travel document" from the Iran

12  embassy. Dkt. 7 at ¶ 12. Ghasedi replies that he attempted to contact the Iran consulate but was

13  never successful and the consulate was unwilling to provide him with written proof of the

14  attempts. Dkt. 8-1 at ¶ 13. In February 2025, ICE removed his ankle monitoring device. Dkt. 1 at

15  ¶ 85; Dkt. 8-1 at ¶ 16.

16  When Ghasedi reported to the ICE office on July 17, 2025, he was arrested and detained

17  unexpectedly and transferred to Tacoma, Washington for detention. Dkt. 1 at ¶ 69. At the

18  Tacoma detention center, Petitioner was given a notice of revocation of release, which stated that

19  the decision to re-detain him "has been made based on a review of [his] case, [his] existing order

20  of removal, and determination that there is a significant likelihood of [his] removal in the

21  reasonably foreseeable future." *Id.*; *see* Dkt. 8-1 at 16 (notice of revocation of release). ICE

22  officers gave Ghasedi no explanation for the arrest beyond that "the judge in Tacoma wanted to

23  see [him] in court." Dkt. 8-1 at ¶ 19.

REPORT AND RECOMMENDATION - 3

1   While in detention, Ghasedi has been suffering from cutaneous abscess, a medical

2   condition causing him serious pain and discomfort. *Id.* at ¶ 23. He claims a nurse suggested

3   surgery on August 31, 2025, but ICE ignored repeated requests for medical treatment, including

4   after his attorney wrote to ICE. *Id.* He was taken to the hospital on October 21, 2025, seven days

5   after the filing of his habeas petition. *Id.*

6   In his petition, Ghasedi claims (1) the government violated the Administrative Procedure

7   Act via arbitrary and capricious agency action by re-detaining him without a rational connection

8   to the facts of his case, (2) the Fifth Amendment Due Process Clause and statute require that

9   before third country removal, the government must reopen his removal proceedings, provide

10  evidence that a third country will accept him, and allow him to present a claim under the

11  Convention Against Torture as to that country, (3) his detention violates due process under

12  *Zadvydas v. Davis* because his removal is not reasonably foreseeable, and (4) if his removal

13  proceedings are reopened, due process prohibits Respondents from re-detaining him without a

14  hearing before a neutral adjudicator at which the government must prove by clear and convincing

15  evidence that his release conditions should be modified. Dkt. 1 at 28–31. He prays for a writ of

16  habeas corpus releasing him from custody and enjoining transfer to another district before this

17  proceeding is concluded, as well as an injunction preventing Respondents from designating a

18  third country for removal without reopening removal proceedings. *Id.* at 31–32.

19                                      **DISCUSSION**

20  A district court may issue a writ of habeas corpus on a showing that a petitioner's custody

21  violates the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2241(c)(3). The

22  habeas petitioner bears the burden of proving by a preponderance of the evidence that he is held

23  contrary to law. *Parke v. Raley*, 506 U.S. 20, 31 (1992). Under § 2241, federal courts have

REPORT AND RECOMMENDATION - 4

jurisdiction over challenges to the detention of noncitizens prior to their removal. *Zadvydas v. Davis*, 533 U.S. 678 (2001). District courts lack jurisdiction over habeas corpus petitions challenging final orders of removal. *Aden v. Nielsen*, 409 F. Supp. 3d 998, 1005 (W.D. Wash. 2019). But courts retain jurisdiction over petitions like the one here, which challenges not the order of removal but detention, the process used to detain, and the designation of a removal country outside of removal proceedings. *Id.*

## I.    *Zadvydas* Claim

Ghasedi argues he is detained in violation of the Due Process Clause of the Fifth Amendment because his removal is not reasonably foreseeable as required by *Zadvydas v. Davis*, 533 U.S. 678 (2001). The government responds his detention is reasonably foreseeable. Ghasedi has the better argument.

Ghasedi is detained under 8 U.S.C. § 1231, which governs the detention and release of noncitizens who have been ordered removed (as opposed to noncitizens apprehended at the border under § 1225, or those not yet ordered removed, § 1226). Under § 1231, the government must detain a noncitizen during the 90 days following the entry of the removal order, during which time ICE attempts removal. 8 U.S.C. § 1231(a)(2)(A). Ghasedi's 90-day removal period expired on June 22, 2021. Dkt. 6 at 6. After 90 days, the government may detain the noncitizen or release the noncitizen under supervision. § 1231(a)(6).

While the government may detain a noncitizen, § 1231 "does not permit indefinite detention." *Zadvydas*, 533 U.S. 678 at 689. "[T]he Due Process Clause applies to all 'persons' within the United States, including [noncitizens], whether their presence here is lawful, unlawful, temporary, or permanent." *Id.* at 693. Due process requires a noncitizen be detained under § 1231 no longer than "a period reasonably necessary to bring about . . . removal from the United

1   States." *Id.* at 689. Detention is presumptively reasonable for six months after the removal

2   period. "After this 6-month period, once the [noncitizen] provides good reason to believe that

3   there is no significant likelihood of removal in the reasonably foreseeable future, the

4   Government must respond with evidence sufficient to rebut that showing." *Id.* at 701. If the

5   government fails to rebut the noncitizen's showing, the noncitizen is entitled to habeas relief.

6       Ghasedi's detention is outside the presumptively reasonable period because his total

7   detention exceeds six months. He was detained from March 24, 2021 to July 29, 2021 and again

8   from July 17, 2025 to the present day. Total length of confinement need not be consecutive to

9   reach the six-month presumptively reasonable limit established in *Zadvydas*. *Nguyen v. Scott*,

10  No. 2:25-CV-01398, 2025 WL 2419288 (W.D. Wash. Aug. 21, 2025).

11                        **A.**      **Petitioner's Burden Under *Zadvydas***

12      Ghasedi has met his initial burden to show good reason to believe there is no significant

13  likelihood of his removal in the reasonably foreseeable future. First, he correctly argues the

14  government has failed to remove him for the four years since March 2021, states no timeframe

15  for removal, and has not yet obtained a travel document for him from Iran or another country.

16  Dkt. 1 at ¶ 81; Dkt. 8 at 5. The government's response confirms it has not received—or

17  requested—a travel document from Iran or another country. *See* Dkts. 6, 7. The government did

18  send a travel document request to Iran when Ghasedi was first detained in April 2021, and the

19  Iran embassy interviewed Ghasedi back then, but Iran did not send a travel document. Dkt. 7 at

20  ¶ 9. Now, the government states it has internally prepared a renewed travel document request but

21  does not mention sending that request to Iran and does not mention any communication with Iran

22  since Ghasedi was re-detained. Dkt. 7 at ¶ 16.

23

REPORT AND RECOMMENDATION - 6

Second, Ghasedi argues ICE has designated Iran as one of 15 "uncooperative" countries that does not facilitate deportations of its citizens. Dkt. 8 at 5. He substantiates this statement with a November 2024 ICE memorandum, which says 2,618 Iran nationals have yet to be removed and lists specific factors that lead to a country being classified as "uncooperative," including "hindering ICE's removal efforts by refusing to conduct consular interviews when necessary; refusing to accept charter removal missions; having an unacceptable ratio of releases when compared to removals and/or unacceptable average time from executable final order of removal to removal; and/or denying or delaying issuance of travel documents, such as passports." Dkt. 8-1 at 8 n.4 (ICE memorandum, Exhibit A to Ghasedi's response).

In sum, Ghasedi meets his burden by arguing the government does not indicate a date or timeframe for Ghasedi's removal, apparently has not renewed its travel document request with the Iran embassy, does not state when it expects to finalize or send the request to Iran, does not mention communication with Iran about Ghasedi's case since he was re-detained, and has designated Iran as uncooperative with removal efforts. *See Seretse-Khama v. Ashcroft*, 215 F. Supp. 2d 37, 50 (D.D.C. 2002) (removal not reasonably foreseeable where government had "not demonstrated . . . that any travel documents are in hand, nor have they provided any evidence, or even assurances from the [foreign] government, that travel documents will be issued in a matter of days or weeks or even months"); *Singh v. Whitaker*, 362 F. Supp. 3d 93, 101–02 (W.D.N.Y. 2019) (removal not reasonably foreseeable where government had no specific timeframe for removal and no travel document despite frequent follow-ups with the consulate); *Andreasyan v. Gonzales*, 446 F.Supp.2d 1186, 1189-90 (W.D. Wash. 2006) (finding removal not likely in reasonably foreseeable future when noncitizen detained for eight months and consulate stated only that case was still under review pending a decision).

1    Ghasedi also argues that his detention violates due process because he is not a flight risk

2    or a danger to the community, as demonstrated by his "history of attending his ICE check-ins

3    and complying with the terms of his release, his track record of the past four years, and his long

4    residence in the U.S. and his family ties in the local community." Dkt. 1 at ¶ 83. He also points

5    out before he was re-detained, ICE removed his ankle monitoring device, which implicitly

6    indicates ICE does not consider him to be a flight risk or a danger to the community. *Id.* at ¶ 85.

7    Respondents do not contest this point, focusing instead on whether removal is reasonably

8    foreseeable. Dkt. 6 at 7. To be clear, relief under *Zadvydas* does not require a finding that

9    Ghasedi is not a flight risk or a danger to the community. However, as a separate basis for relief,

10    the absence of any showing that Ghasedi poses a flight risk or a danger supports release from

11    detention.

12    Finally, Ghasedi argues the "multi-step processes" of designating an additional removal

13    country and presenting a claim under the Convention Against Torture could take a year to

14    several years and render his removal not reasonably foreseeable. Dkt. 1 at ¶ 81. He cites no

15    authority supporting *Zadvydas* relief under these conditions. As no such proceedings have

16    commenced, and the government contends it does not intend third country removal, the

17    possibility of this process delaying his removal is too speculative to weigh in his favor. However,

18    as discussed above, he has met his burden for other reasons.

19    **B.    Respondents' Burden Under *Zadvydas***

20    Once Ghasedi has met his burden, the burden shifts to respondent to rebut the showing.

21    *Zadvydas*. Respondents' materials, as discussed above, confirm the government sent a travel

22    document request to the Iran embassy in 2021, scheduled and completed an interview with the

23    Iran embassy. Dkt. 7 at ¶ 9. Although the government "continued to communicate with the

1   embassy," it did not receive a travel document from Iran at that time. *Id.* After Ghasedi was re-

2   detained, Enforcement and Removal Operations prepared an updated travel document request,

3   including a copy of Ghasedi's passport and birth certificate, which was sent to the Detention and

4   Deportation Officer within ICE on October 29, 2025. *Id.* at ¶ 16. It appears that request has not

5   yet been sent to the Iran embassy. *Id.* Respondents do not mention communicating with or

6   scheduling an interview with the Iran embassy since Ghasedi's re-detention. The government

7   states that since it has Ghasedi's national ID number and passport number, Iran "should be able"

8   to confirm his citizenship status, and that it "expects that Iran will issue a travel document for

9   Petitioner." *Id.* at ¶¶ 17, 19. But the government provides no concrete facts on which to premise

10  that expectation.[1]

11          Respondents also contend there is a "significant likelihood of removal in the reasonably

12  foreseeable future to Iran, despite prior difficulties in executing removal," because "[a]ccording

13  to [Enforcement and Removal Operations headquarters], Iran is currently issuing [travel

14  documents] for individuals ordered removed and there are flights to Iran to effectuate removal of

15  [noncitizens] from the United States." Dkt. 7 at ¶ 18. However, Respondents do not specify how

16  many travel documents the Iran embassy has recently issued or how many noncitizens with final

17  orders of removal have successfully been removed to Iran. The generalized statement that Iran

18

19  ───────────────────────────────

    [1] Ghasedi argues that the government's expectation of receiving a travel document is also
20  unreasonable because his file contains copies rather than originals of his passport and birth
    certificate. He cites to *Kamyab v. Bondi*, No. 2:25-cv-00389-RSL, Dkt. 21 (W.D. Wash. Oct 14,
21  2025) for the proposition that Iran requires original documents to issue travel documents. Dkt. 8
    at 4–5. In *Kamyab*, a declaration from an ICE officer stated that the Iran government required
22  original documents to process a travel document request. *See Kamyab*, Dkt. 13 at ¶ 5 ("Iran is
    aware of the case and stated they need to review original documents, for example, passport or
23  birth certificate."). However, there is no indication of whether that requirement was specific to
    that petitioner's case, and here the government has not stated affirmatively that it cannot procure
    original documents. The Court therefore does not weigh this point in the *Zadvydas* analysis.

1    "is currently issuing" an unspecified number of travel documents during an unknown time period

2    is insufficient to rebut Ghasedi's specific contentions that ICE has designated Iran as

3    uncooperative and that 2,618 Iran nationals with final orders of removal remain in the United

4    States. *See Nguyen*, 2025 WL 2419288, at *16 (similar declarations were insufficient to meet the

5    government's burden where "[a]t most, they establish that [the country of removal] is accepting

6    more of its citizens for repatriation," which does not equate to a significant likelihood of removal

7    in the reasonably foreseeable future); *Yang v. Kaiser*, No. 2:25-CV-02205-DAD-AC (HC), 2025

8    WL 2791778, at *6 (E.D. Cal. Aug. 20, 2025) (removal not reasonably foreseeable where

9    respondent merely stated deportees had recently been removed to China, whereas petitioner

10   showed that the Chinese government had been designated as recalcitrant to repatriation and that

11   respondents had failed for years to deport him to China).

12        The government's representation is therefore insufficient to rebut Ghasedi's showing.

13   "Courts in this circuit have regularly refused to find Respondents' burden met where

14   Respondents have offered little more than generalizations regarding the likelihood

15   that removal will occur." *Nguyen*, 2025 WL 2419288, at *16; *see Singh v. Gonzales*, 448 F.

16   Supp. 2d 1214, 1220 (W.D. Wash. 2006); *Chun Yat Ma*, 2012 WL 1432229, at *4–5.

17        The government's other arguments are unavailing. First, Respondents argue there is no

18   bright-line rule that ICE must have a travel document in hand for removal to be reasonably

19   foreseeable. Dkt. 6 at 9. That is correct as far as it goes. *See Khan v. Fasano*, 194 F. Supp. 2d

20   1134 (S.D. Cal. 2001) (removal reasonably foreseeable where travel document request was

21   pending approval). However, the government not only lacks a travel document but has not yet

22   renewed its request for one, states no expected timeframe for procuring one, has failed to remove

23   the petitioner for over four years, and has designated the country of removal as uncooperative.

REPORT AND RECOMMENDATION - 10

1   Ghasedi has more support for his claim than the mere absence of a travel document. *See Singh v.*

2   *Gonzales*, 448 F. Supp. 2d 1214, 1220 (W.D. Wash. 2006) (ICE had not met its burden where it

3   could not provide any substantive indication regarding how or when it expected to obtain the

4   travel document).

5          Respondents also contend "[d]etention becomes indefinite in situations where the country

6   of removal refuses to accept the noncitizen or if removal is legally barred," and Ghasedi has not

7   shown either is the case. Dkt. 6 at 10. The case cited for that proposition is *Diouf v. Mukasey*,

8   542 F.3d 1222 (9th Cir. 2008), which the Court reads differently. The Ninth Circuit denied the

9   petitioner *Zadvydas* relief because the record provided "no reason to believe" that he would be

10  "unremovable even if the government defeated his petition for review," and continued: "There is

11  no evidence, <u>for example</u>, that Senegal would refuse to accept him, or that his removal is barred

12  by our own laws." The Court reads these as examples of sufficient conditions to meet the

13  *Zadvydas* burden, not a statement of what is necessary to meet the burden.

14         And, while it is true that "mere delay in the issuance of a travel document" is insufficient

15  to meet a petitioner's burden, Dkt. 6 at 9, Respondents cite cases to support this point in which

16  the government uniformly made more progress in procuring the travel document than it has here.

17  *Galtogbah v. Sessions*, 2019 WL 3766280, at *2 (W.D. La. June 18, 2019) (travel document

18  request sent to consulate, interview occurred, petitioner approved for charter flight); *Walcott v.*

19  *Homeland Sec. (BICE)*, No. CIV.A. 05-0410 (MLC), 2005 WL 3544342 (D.N.J. Dec. 28, 2005)

20  (only apparent reason petitioner had not yet been removed was the stay of removal pending

21  habeas relief); *Khan v. Fasano*, 194 F. Supp. 2d 1134 (S.D. Cal. 2001) (travel document request

22  submitted and pending approval, meeting scheduled with consulate); *Nasr v. Larocca*, 2016 WL

23  3710200, at *4 (C.D. Cal. June 1, 2016) (consulate requested and received travel documents,

1   petitioner had multiple telephone conversations with consular officials). Similarly, Respondents'

2   argument that delay by the <u>foreign</u> government does not meet the burden, Dkt. 6 at 10, is beside

3   the point. As a new travel document request has not been sent, the United States, not Iran, is

4   causing the delay.

### C.    Petitioner's Compliance with the Order of Supervision

6          There is a fact dispute regarding Ghasedi's compliance with his order of supervision.

7   Ghasedi claims he complied fully with the order while released. Dkt. 8-1 at ¶ 13. The

8   government contends Ghasedi violated the conditions of his order of supervision, by leaving

9   Oregon several times and by failing to cooperate in obtaining a travel document from the Iran

10  embassy. Dkt. 7 at ¶ 11–12. For his part, Ghasedi claims all his trips were less than 48 hours, that

11  he attempted to contact the Iran consulate but was never successful, and that ICE's removal of

12  his ankle monitoring device in February 2025 implies his compliance. Dkt. 8-1 at ¶¶ 13, 15, 16.

13         The fact dispute may matter for two reasons. However, on both counts the Court finds

14  this dispute does not affect the *Zadvydas* analysis and it is therefore unnecessary to resolve it.

15  First, Ghasedi may lawfully be re-detained upon a finding that he did indeed violate a condition

16  of his order of supervision. *Zadvydas*, 533 U.S. 678 at 700 (noncitizen "may no doubt be

17  returned to custody upon a violation" of release conditions). But the government does not argue

18  that Ghasedi was re-detained because he violated any specific release condition. Nor does the

19  record reflect that any ICE official made a finding of non-compliance in ordering re-detention.

20  Rather, the government merely mentions in a footnote that "while on supervised release Ghasedi

21  repeatedly violated the conditions of his release," Dkt. 6 at 4 n.2. Respondents have made no

22  showing that any process was followed to re-detain Ghasedi that involved consideration of his

23  compliance with the conditions of release. Thus, the passing mention of his noncompliance

appears extraneous to the analysis. *Pacito v. Trump*, 772 F. Supp. 3d 1204, 1222 (W.D. Wash. 2025) ("[p]ost-hoc rationalizations cannot justify an agency's action;" nor can courts infer an agency's reasoning from silence). Indeed, this dispute over compliance with conditions of release reflects the importance of ICE following its own procedures when re-detaining noncitizens, to ensure a record of exactly what happened to trigger re-detention.

Second, the government alleges Ghasedi was "determined as not being cooperative in obtaining a travel document" from Iran. Dkt. 7 at ¶ 12. The Ninth Circuit has held that a noncitizen who refuses to cooperate to secure a travel document cannot meet his burden under *Zadvydas* to show that removal is not reasonably foreseeable. *Lema v. I.N.S.*, 341 F.3d 853 (9th Cir. 2003). However, Ghasedi's alleged noncooperation, even if true, does not rise to the level of dooming his *Zadvydas* claim. In *Lema v. I.N.S.*, 341 F.3d 853 (9th Cir. 2003), for example, the court held the petitioner could not meet his *Zadvydas* burden where he repeatedly obstructed removal efforts by lying about his nationality, refusing to accept a letter requiring him to apply for travel documents, refusing to provide the government with relevant documents, and refusing to contact the consulate. In *Diouf v. Mukasey*, 542 F.3d 1222 (9th Cir. 2008), ICE successfully completed arrangements for removal twice, but the petitioner refused to depart even though he was detained. Here, by contrast, the bare allegation that he was "determined as not being cooperative," without details, is insufficient to defeat his *Zadvydas* claim.

Because Ghasedi has met his burden to show removal is not reasonably foreseeable and the government has failed to rebut it, Ghasedi is entitled to release "conditioned on any of the various forms of supervised release that are appropriate in the circumstances." *Zadvydas*, 533 U.S. 678 at 700.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

## II.    Third Country Removal

Ghasedi contends he "is currently living in near-paralyzing fear that ICE will remove him to a third country [other than Iran] where he would have no family ties and would be at direct risk of torture," from which country he could then be deported to Iran (a process known as "chain refoulement"). Dkt. 1 at ¶ 73. He does not contest Respondents' authority to remove him to a third country. Rather, he asks for notice and an opportunity to respond if the government should attempt third country removal. Specifically, he seeks to enjoin Respondents from removing him to a third country without first (1) reopening his Section 240 removal proceedings, so an immigration judge may designate a specific country for removal, and (2) providing him with an opportunity to present a claim for deferral of removal as to that country under the Convention Against Torture (CAT). *Id.* at 31–32.

The government responds it has no "present interest" in third country removal, so Ghasedi's concern is unsubstantiated and speculative. Dkt. 6 at 11. But it argues that <u>if</u> it did decide to remove Ghasedi to a third country, it would not be required to give him the process he demands. Respondents argue under "current USCIS policy," DHS has the authority to effect third country removal without the involvement of an immigration judge, without reopening removal proceedings, and without giving a noncitizen an opportunity to present a CAT claim, "within 24 hours after the third country agrees to accept [him] and a Notice of Removal is served." *Id.* at 11–12.

The government is incorrect. As another court in this district recently found, a "noncitizen must be given sufficient notice of a country of deportation that, given his capacities and circumstances, he would have a reasonable opportunity to raise and pursue his claim for withholding of deportation." *Nguyen*, 2025 WL 2419288, at *18 (quoting *Aden*, 409 F. Supp. 3d

998 at 1010). Due process includes the right to "a full and fair hearing, an impartial decisionmaker, and evaluation of the merits of his or her particular claim." *Id.* The due process clause requires the government to "provide a meaningful opportunity to be heard on asylum and withholding claims." *Id.* These requirements "flow directly from binding Ninth Circuit precedent," and to the extent ICE policy contradicts them, it is unlawful. *Id.* at *19 ("It would be impossible to comply both with Ninth Circuit precedent and the policy.").

In *Aden*, the petitioner was ordered to be removed to Kenya; however, after Kenya denied his travel document request, ICE scheduled his removal to Somalia without notice or an opportunity to be heard. *Aden*, 409 F. Supp. 3d 998 at 1003. The court held due process required that the removal proceedings against the petitioner be reopened and a hearing held before the immigration judge so that the petitioner could apply for relief to Somalia.

While DHS has the authority to designate a country of removal, "it must exercise that authority in an appropriate way." *Id.* at 1009. It must comply with due process. Here, that means that if DHS seeks to remove Ghasedi to a third country, it must move to reopen Section 240 removal proceedings, and a hearing must be held before an immigration judge so that the petitioner can apply for relief as to the specific country of removal.

The government correctly points out, however, that Ghasedi requests an injunction—he asks the Court to enjoin Respondents from designating a third country for removal without opening removal proceedings and allowing for a CAT claim—but he does not show he is entitled to an injunction under the standard in *Winter v. Natural Resources Defense Council,* 555 U.S. 7, 20 (2008). A plaintiff seeking a preliminary injunction must show: (1) he is likely to succeed on the merits, (2) he is likely to suffer irreparable harm absent preliminary relief, (3) the balance of equities tips in his favor, and (4) the relief sought is in the public interest. *Winter*, 555 U.S. 7 at

20. The movant must make a showing on each element of the *Winter* test. Ghasedi fails to provide any argumentation or briefing on the *Winter* test.

As discussed above, <u>if</u> third country removal should occur without the reopening of removal proceedings and an opportunity to present a fear-based claim, Ghasedi has shown a likelihood of success on that prospective claim. Such an act would be unconstitutional. And the balance of equities and the public interest, "merge[d] when the Government is a party," favor Ghasedi because of the "public interest in preventing noncitizens from being wrongfully removed, particularly to countries where they are likely to face substantial harm." *Nguyen*, 2025 WL 2419288, at *28.

Irreparable harm, however, is more speculative. The government claims it does not intend to remove Ghasedi to a third country. The Supreme Court in *Winter* cautioned that "[i]ssuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. 7 at 22. "Speculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction." *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1022 (9th Cir. 2016). Ghasedi does make some showing as to irreparable harm (though he does not label it as such) by arguing that third country removal has become a common practice, the federal government "has aggressively acted to remove individuals to countries other than those designated for removal," and that a number of noncitizens have been removed to third countries. Dkt. 1 at ¶¶ 52–59.

Should the government move forward with removal to a third country without reopening removal proceedings, disregarding the requirements of due process as laid out in *Nguyen*, 2025 WL 2419288, and the Ninth Circuit precedent upon which it relies, Ghasedi is free to move for

injunctive relief at that point, demonstrating his entitlement to an injunction and the likelihood of irreparable harm. While the Court recognizes that the *Nguyen* court found irreparable harm and authorized injunctive relief as to third country removal even where the government promised not to remove the petitioner to a third country, the petitioner in that case offered ICE policy and the testimony of counsel for other similarly situated individuals in support of irreparable harm. *Nguyen*, 2025 WL 2419288, at *26–27. At this point, given the parties' failure to brief or analyze the *Winter* factors, and without a showing that irreparable harm is likely as to Ghasedi specifically, the Court declines to recommend entering hypothetical injunctive relief.

In the same language he uses to request an injunction, Ghasedi requests declaratory relief "that Respondents may not designate a third country for Petitioner's removal without reopening Petitioner's removal proceedings so that an Immigration Judge can make the designation in the first instance and adjudicate Petitioner's application under the Convention Against Torture as to that county." Dkt. 1 at 31–32. The Court recommends that declaratory relief be denied for the same reasons that injunctive relief should be denied.

### III.    Petitioner's Other Claims

Ghasedi brings a claim that his detention violates the Administrative Procedure Act. Dkt. 1 at ¶¶ 89–93. The government argues that claim must be dismissed for lack of subject matter jurisdiction. Dkt. 6 at 5–6. Ghasedi also argues, for the first time in his response to the government, that ICE did not comply with its own regulations governing re-detention. Dkt. 8 at 6–7. The government has had no opportunity to respond, so this issue has not been fully briefed, though the Court notes that several courts have found that ICE's recent wave of revocations of orders of supervision violated its own regulations and therefore violated due process, including with respect to noncitizens with final orders of removal. *See, e.g.*, *Villanueva-Herrera v. Tate*,

1    4:25-cv-03364 (S.D. TX Sep. 26, 2025), Dkt. 14; *Yang*, 2025 WL 2791778; *Sun v. Santacruz*,

2    No. 5:25-CV-02198-JLS-JC, 2025 WL 2730235 (C.D. Cal. Aug. 26, 2025).

3          Because the Court recommends granting relief based upon Ghasedi's *Zadvydas* claim,

4    which encompasses the relief connected to these claims, the Court declines to address these

5    claims.

6          Ghasedi also argues that "due process prohibits Respondents from re-detaining [him]

7    absent a hearing at which a neutral adjudicator could determine whether the government can

8    prove by clear and convincing evidence that [his] release conditions should be modified." Dkt. 1

9    at 101. He does not, however, pray for any relief in connection with this claim, or show

10   entitlement to injunctive relief, and Respondents also do not address this request. The Court

11   therefore declines to address Ghasedi's argument.

12                                   **CONCLUSION**

13         The Court recommends that a writ of habeas corpus issue and that Ghasedi be released,

14   conditioned on appropriate forms of supervised release.

15                              **OBJECTIONS AND APPEAL**

16         This Report and Recommendation is not an appealable order.  Therefore, Petitioner

17   should not file a notice of appeal seeking review in the Court of Appeals for the Ninth Circuit

18   until the assigned District Judge enters a judgment in the case.

19         Objections, however, may be filed and served upon all parties no later than **December**

20   **15, 2025.**  The Clerk should note the matter for **December 16, 2025**, as ready for the District

21   Judge's consideration if no objection is filed.  If objections are filed, any response is due within

22   14 days after being served with the objections. A party filing an objection must note the matter

23   for the Court's consideration 14 days from the date the objection is filed and served. The matter

REPORT AND RECOMMENDATION - 18

will then be ready for the Court's consideration on the date the response is due. The failure to timely object may affect the right to appeal.

DATED this 1st day of December, 2025.

BRIAN A. TSUCHIDA
United States Magistrate Judge

REPORT AND RECOMMENDATION - 19